[No. B137593. Second Dist., Div. Six. Mar. 25, 2003.]

JERVE M. JONES et al., Plaintiffs, Cross-defendants and Appellants, v. FIRST AMERICAN TITLE INSURANCE COMPANY et al., Defendants, Cross-complainants and Appellants.

## Counsel

Norman, Dowler, Sawyer, Israel, Walker & Barton, Richard M. Norman, Michael G. Walker and Matthew P. Guasco for Plaintiffs, Cross-defendants and Appellants.

Ferguson, Case, Orr, Paterson & Cunningham, Michael W. Case, Joseph L. Strohman, Jr., and Douglas E. Kulper for Defendant, Cross-complainant and Appellant First American Title Insurance Company.

Arter & Hadden, John L. Hosack, Aaron M. Peck and Andrea L. Slade for Defendant, Cross-complainant and Appellant Union Bank of California, N.A.

Epstein Becker & Green, Alan E. Walcher and Diane B. Sherman for Defendant, Cross-complainant and Appellant Heritage Oak Partners.

## Opinion

**GILBERT, P. J.**—Civil Code section 2934a, subdivision (a)(4)[1] provides that the beneficiary of a deed of trust may replace the appointed trustee simply by recording a substitution, and that "the new trustee shall succeed to all the powers, duties, authority, and title granted and delegated to the trustee named in the deed of trust." We conclude that under the circumstances here reformation may validate a foreclosure sale under section 2934a[2] when a former trustee mistakenly conducts the sale after a new trustee has been substituted.

### Facts and Procedural History

#### *The Loan and Deed of Trust*

In June 1988, LCF Income Group (hereafter LCFIG), La Canada Flintridge Development Corporation (hereafter LCFDC), San Martin Investment Development Corporation (hereafter San Martin), and Peppertree Corporate Business Park, Ltd. (hereafter Peppertree), obtained a loan in the

---

[1]All further statutory references are to the Civil Code unless otherwise noted.

[2]Section 2934a, subdivision (a) provides in part: "(a)(1) The trustee under a trust deed upon real property or an estate for years therein given to secure an obligation to pay money and conferring no other duties upon the trustee than those which are incidental to the exercise of the power of sale therein conferred, may be substituted by the recording in the county in which the property is located of a substitution . . . . [¶] . . . [¶] (4) The substitution shall contain the date of recordation of the trust deed, the name of the trustor, the book and page or instrument number where the trust deed is recorded, and the name of the new trustee. From the time the substitution is filed for record, the new trustee shall succeed to all the powers, duties, authority, and title granted and delegated to the trustee named in the deed of trust."

amount of $8.7 million from the predecessor in interest to Union Bank of California (hereafter the bank). The borrowers used the loan proceeds to purchase and develop property in Simi Valley (hereafter the Peppertree property). The loan was secured by a deed of trust on the Peppertree property. The deed of trust contained the standard provision for nonjudicial foreclosure in the event of default. Jerve M. Jones, Gilbert Dreyfuss and Evelyn Dreyfuss personally guaranteed the loan.[3] California-Sansome Corporation, a subsidiary of the bank, was designated as trustee.

The loan was due on July 1, 1991. After the borrowers defaulted, the bank agreed to modify the loan to extend the due date to October 1993. In exchange, LCFIG gave deeds of trust on parcels of real property in Maryland (hereafter the Maryland property) and California (hereafter Lot 66) as additional security. The bank also allowed the borrowers to sell parcel 2 of the Peppertree property to pay down the loan, and reconveyed the parcel for that purpose.

### The Substitution of First American as Trustee and Institution of Foreclosure Proceedings

When the borrowers defaulted again, the bank instituted foreclosure proceedings against the Peppertree property, the Maryland property, and Lot 66. On February 9, 1994, the bank recorded a document substituting First American Title Insurance Company (hereafter First American) as trustee in place of the California-Sansome Corporation. That same date, First American recorded a notice of default on the Peppertree property deed of trust. In order to stay foreclosure, LCFDC and LCFIG filed chapter 11 bankruptcy proceedings. The automatic stay was lifted on April 14, 1995. First American subsequently recorded a notice of sale on May 18, 1995.

### The Limited Forbearance Agreement and Release

On June 29, 1995, the parties executed a limited forbearance agreement. The agreement provided that the borrowers would make an initial payment of $1.2 million, obtain release of a setaside letter pledged by the bank on the borrowers' behalf, and pay an additional $4 million by December 1, 1995. The borrowers also agreed to "deliver to Lender such certificates . . . (a) to confirm that the postponement of Lender's foreclosure sales on the Peppertree Property and Lot 66 in accordance with this Forbearance Agreement has

---

[3]The Dreyfusses own LCFDC, and LCFIG is a general partnership of two Dreyfuss family trusts. Peppertree is a limited partnership controlled by Jerve Jones and his sons, and San Martin is Peppertree's general partner. The borrowers and guarantors are sometimes collectively referred to as "the borrowers" as the context requires.

occurred by the mutual consent of the parties pursuant to California Civil Code § 2924 (g) (c) (2) [2924g (c)(2)], and (b) to confirm that the acceptance by Lender of the Initial Payment shall have no adverse effect on Lender's presently pending foreclosure proceedings against said properties." In exchange, the bank agreed to extend the due date on the loan and forgive the remaining indebtedness of approximately $1.3 million. The borrowers subsequently made the initial payment and obtained release of the setaside letter. The forbearance agreement also contained a general release by which the borrowers and guarantors released the bank from any and all claims, known and unknown.

### The Bank's Substitution as Trustee and the Partial Reconveyance

As an accommodation to the borrowers, the bank also agreed to release parcel 3 of the Peppertree property from the trust deed for sale to a third party. On October 20, 1995, Chicago Title Company, the escrow agency chosen by the borrowers to conduct the purchase and sale, requested that the bank forward a partial reconveyance for parcel 3 along with its demand for payment.

The bank subsequently approved the sale and sent Chicago Title its demand on October 26, 1995, along with a document entitled "Substitution of Trustee and Partial Deed of Reconveyance." In that document, the bank substituted itself as trustee in place of First American. Bank employees testified the bank intended to substitute itself as trustee only as to parcel 3, and to otherwise retain First American as trustee for purposes of the already pending foreclosure proceedings. The substitution however was not so limited.[4] The bank appeared as trustee for all parcels. The demand letter directed Chicago Title to record the document upon satisfaction of all conditions.

On three different occasions, the bank sent copies of the substitution along with updated demand letters to Gilbert Dreyfuss and Michael Milam, the chief financial officer of LCFIG and LCFDC. Dreyfuss and Milam each claimed that they did not review the substitutions of trustee that were sent to them by the bank. Chicago Title recorded the substitution of trustee and partial reconveyance on the borrowers' behalf on November 20, 1995. The borrowers subsequently contributed the sale proceeds from parcel 3 ($1.49

---

[4]The document provided in pertinent part: "WHEREAS, the undersigned desires to substitute a new Trustee under said Deed of Trust in the place and instead of First American Title Insurance Company. [¶] NOW THEREFORE, the undersigned hereby substitutes [the bank] as Trustee under said Deed of Trust . . . . [¶] The undersigned hereby accepts such assignment and as such Trustee DOES HEREBY RECONVEY to the person or persons legally entitled thereto, without warranty, all the estate, title, and interest acquired by Trustee under said Deed of Trust in and to . . . Parcel 3 . . . ."

million) to reduce the discounted amount owed under the forbearance agreement to $2,510,000.

### The Extension of the Limited Forbearance Agreement and Postponements of the Foreclosure Sale

On December 6, 1995, the parties executed an extension to the limited forbearance agreement whereby the bank agreed to extend the loan until December 21, 1995, in exchange for, among other things, borrowers' promise to provide documentation confirming "that the postponement of Lender's foreclosure sales on the Peppertree Property and Lot 66 in accordance with the Forbearance Agreement and/or this Extension Agreement has occurred by the mutual consent of the parties pursuant to California Civil Code § 2924 (g) (c) (2)." The borrowers also "reaffirm[ed] and confirm[ed] their respective releases of claims in favor of Lender as set forth in Section VIII of the Forbearance Agreement as of the date hereof." First American postponed the sale five times pursuant to the borrowers' consent.

The borrowers once again defaulted. On January 4, 1996, the bank informed the borrowers that it had terminated their right to pay a discounted amount under the limited forbearance agreement and demanded payment in excess of $3.8 million. After the foreclosure sale was scheduled for January 9, 1996, LCFIG filed another bankruptcy petition. The bank obtained relief from the automatic stay, and rescheduled the foreclosure sale for January 30, 1996.

### The Foreclosure Sale

As directed by the bank, First American conducted the foreclosure sale on the Peppertree property on January 30, 1996. A representative appeared at the sale on behalf of borrowers. The bank obtained the property with a credit bid of $2,150,000, and First American executed a trustee's deed in favor of the bank that was recorded on February 6, 1996. The bank then foreclosed on the Maryland property and Lot 66. It obtained both properties by credit bids of $1.4 million and $200,000, respectively.

On October 18, 1996, the bank sold the Peppertree property to Heritage Oak Partners (hereafter Heritage) for $3,050,000.[5] In September 1996, the bank sold Lot 66 for $110,000.

---

[5]Heritage dismissed its appeal against the borrowers pursuant to settlement after filing its opening brief.

*The Complaint, Lis Pendens, and Quitclaim of Parcels 1 and 5*

On October 18, 1997, Dreyfuss discovered a copy of the substitution of trustee while reviewing documents produced by the bank in another action challenging the bank's foreclosure on the Maryland property and Lot 66.[6] In December 1997, the borrowers filed this complaint against the bank and First American (hereafter collectively the bank), alleging that the foreclosure sale was void under section 2934a and seeking to quiet title. In the meantime, the borrowers quitclaimed parcels 1 and 5 to Heritage for $300,000. The bank answered the complaint and filed cross-complaints seeking reformation or cancellation of the substitution of trustee, and asserting defenses of release, consent, laches, res judicata, and collateral estoppel.

*The Judgment*

In its statement of decision, the trial court noted that "plaintiff was clearly in default on a legitimate obligation . . . [a]nd the Bank and First American Title could just as easily, on the very date of the sale, . . . have carried out a valid foreclosure . . . ." The court concluded, however, that reforming or canceling the substitution of trustee as urged by the bank "would be a wrench in the gears of the machinery facilitating the purchase and improvement of real property in this state . . . ." The court also concluded, among other things, that section 2934a is not subject to waiver because it was enacted for a "public reason" as defined by section 3513. The court did not discuss the bank's contention that the borrowers consented to the sale. In rejecting the defense of laches, the court concluded that the borrowers had merely received "constructive notice" of the substitution of trustee, and thus could not be held accountable for failing to contest First American's authority to conduct the foreclosure sale.

Accordingly, the court rendered the foreclosure sale void pursuant to section 2934a and ordered title to the remaining Peppertree property parcels quieted in the borrowers. The loan balance of $3,860,228 was reinstated. Since foreclosure, the properties had increased in value. Against the balance owing, the trial court credited the borrowers with the fair market value of Lot 66 ($250,000) and the two parcels that the borrowers had quitclaimed to

---

[6]In December 1996, the Dreyfusses and LCFIG filed a complaint against the bank in Los Angeles County Superior Court seeking to set aside the bank's foreclosures on the Maryland property and Lot 66 on the ground, among others, that the bank's failure to give the borrowers credit for the fair market value of those properties violated the antideficiency provisions of Code of Civil Procedure sections 580a and 580d. The California Supreme Court subsequently affirmed the Court of Appeal's decision affirming summary judgment in favor of the bank. (*Dreyfuss v. Union Bank of California* (2000) 24 Cal.4th 400 [101 Cal.Rptr.2d 29, 11 P.3d 383].)

Heritage ($3,470,228), minus the $300,000 that the borrowers had received for those parcels. The court also awarded the borrowers $450,000 in attorney fees and ordered the bank to return the Maryland property. The resulting judgment gave the borrowers the Peppertree property and the Maryland property free and clear of the bank's interest in those properties, with the bank owing the borrowers $10,739.

DISCUSSION

I

 The bank contends the trial court abused its discretion by denying reformation.

Section 3399 provides, "When, through fraud or a mutual mistake of the parties, or a mistake of one party, which the other at the time knew or suspected, a written contract does not truly express the intention of the parties, it may be revised on the application of a party aggrieved, so as to express that intention, so far as it can be done without prejudice to rights acquired by third persons, in good faith and for value."

In denying reformation the trial court found that the bank's substitution of trustee was not a mistake; the mistake was in the failure to resubstitute First American as trustee prior to foreclosure. The court also found the mistake was not mutual nor one that the other party knew or suspected.

But the trial court viewed its powers of reformation too narrowly. It is well settled that the remedy of reformation is equitable in nature and not restricted to the exact situations stated in section 3399. (*Demetris v. Demetris* (1954) 125 Cal.App.2d 440, 443 [270 P.2d 891].)

The broad reach of reformation is illustrated in *Merkle v. Merkle* (1927) 85 Cal.App. 87 [258 P. 969]. There the decedent during her life entered into an agreement with the plaintiff that required the plaintiff to care for the decedent. In return, upon the decedent's death, the plaintiff would receive certain real property. The plaintiff performed her part of the agreement. The decedent attempted to perform her part by executing a deed and giving it to a third party with instructions to deliver it to the plaintiff upon the decedent's death. The plaintiff never saw the deed prior to the decedent's death. After the decedent died, the plaintiff discovered that the description of the property in the deed was defective. The trial court granted reformation of the deed. The Court of Appeal affirmed.

In affirming reformation the court recognized that, because the plaintiff never saw the deed, the mistake was "literally" neither mutual nor one that

the plaintiff knew or suspected. (*Merkle v. Merkle, supra,* 85 Cal.App. at p. 105.) The court, however, emphasized the equitable nature of the remedy. Because each party believed the deed would be sufficient to carry out their agreement, the court affirmed that reformation was appropriate to carry out the intent of the parties. (*Id.* at pp. 107-108.)

*Merkle* illustrates that mistake is an ingredient of reformation, but not its essence. The essential purpose of reformation is to reflect the intent of the parties.

Here the parties entered into a complex set of agreements. The agreements included the bank's right to foreclose if the borrowers did not perform. As in *Merkle,* one of the documents necessary to effectuate the agreements was deficient. Under the circumstances, reformation is necessary to carry out the manifest intent of the parties. Mutual mistake is satisfied by the undisputed evidence that at the time of foreclosure all parties believed that the documents were sufficient to carry out the intent of the parties. (See *Merkle v. Merkle, supra,* 85 Cal.App. at pp. 107-108.)

Of course failure to have a recorded trustee conduct a foreclosure sale will not justify reformation in every case. Each case must be judged on its own facts. This case involves a complex set of transactions that included multiple forbearances and a partial release of the trust deed. *Merkle* involved a mistake in the description of property in a deed. Here the mistake concerned only who was to perform a ministerial act. There was no showing the borrowers were prejudiced by the former trustee's conduct of the foreclosure sale. The borrowers claim they did not read the notice of substitution of trustee prior to the sale. The borrowers did not raise the issue until almost two years after foreclosure, when fortuitously the properties had greatly increased in value. More importantly, reformation is an equitable remedy. The trial court's judgment amply shows the failure to apply reformation gives a windfall to the borrowers and works a great injustice on the bank.

The trial court's concern that granting reformation "would be a wrench in the gears of the machinery facilitating the purchase and improvement of real property in this state" is misplaced. To the contrary, here reformation reflects the intent of the parties. This removes a wrench from the machinery so that its gears mesh smoothly to facilitate the purchase and improvement of real property.

The borrowers' reliance on *Dimock v. Emerald Properties* (2000) 81 Cal.App.4th 868 [97 Cal.Rptr.2d 255] is misplaced. There the court held that a foreclosure sale conducted by a former trustee is void. The court reasoned

that the only statutory means of changing a recorded substitution is the recording of another substitution under section 2934a. (*Dimock*, at p. 876.) But *Dimock* did not consider reformation. A case is not authority for propositions not considered. (*Contra Costa Water Dist. v. Bar-C Properties* (1992) 5 Cal.App.4th 652, 660 [7 Cal.Rptr.2d 91].)

Here the trial court expressed concern that noncompliance with section 2934a amounts to a waiver which would violate public policy. We would be reluctant to apply reformation where the result would be tantamount to a waiver of a statutory right in violation of public policy. There is, however, no such concern here.

Any public purpose attendant to section 2934a would not be compromised by allowing waiver in this context. It is well settled that parties to a deed of trust may agree to a form of substitution of trustee other than that provided in section 2934a. (See *Pacific S. & L. Co. v. N. American etc. Co.* (1940) 37 Cal.App.2d 307, 309-311 [99 P.2d 355].)

■ Moreover, no statute expressly prohibits the waiver of section 2934a. Tellingly, the Legislature has enacted a statute enumerating the statutory provisions incident to foreclosure that are not subject to waiver. (§ 2953.) Section 2934a is not included. Following the maxim of statutory construction, *expressio unius est exclusio alterius*, or " 'the expression of one thing is the exclusion of another' " (*People v. Anzalone* (1999) 19 Cal.4th 1074, 1078 [81 Cal.Rptr.2d 315, 969 P.2d 160], quoting Black's Law Dict. (6th ed. 1990) p. 581, col. 1), we conclude that if the Legislature had intended section 2934a to be nonwaivable, it would have included it in section 2953, which prohibits the waiver of rights under sections 2924, 2924b, and 2924c and Code of Civil Procedure sections 580a and 726. (See *Strang v. Cabrol* (1984) 37 Cal.3d 720, 725 [209 Cal.Rptr. 347, 691 P.2d 1013] ["[A]n express exclusion from the operation of a statute indicates the Legislature intended no other exceptions are to be implied"].)

■ The trial court misapprehended the scope of reformation. Remand for the trial court to consider reformation is unnecessary. Under the circumstances here, reformation is the only reasonable disposition. To rule otherwise would be an abuse of discretion. In light of our conclusion, we need not discuss the bank's remaining contentions.[7] The borrowers' cross-appeal, which is predicated on the court's finding that the foreclosure sale is void, is dismissed as moot. The borrowers' claim that they are entitled to their attorney fees on appeal is also moot.

---

[7]The borrowers' December 28, 2001, motion to strike portions of the bank's reply brief relating to its defense of res judicata/collateral estoppel, and the bank's December 14, 2001, motion for judicial notice, are denied as moot.

The judgment is reversed and the matter is remanded for further proceedings consistent with this opinion. Appellants Union Bank and First American shall recover their costs on appeal.

Yegan, J., and Coffee, J., concurred.

A petition for a rehearing was denied April 23, 2003, and the opinion was modified to read as printed above. The petition of appellants Jerve M. Jones et al., for review by the Supreme Court was denied July 23, 2003. George, C. J., and Brown, J., did not participate therein.