Filed 4/9/15  Napoleon Pictures Ltd. v. Fox Searchlight Pictures CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| NAPOLEON PICTURES LIMITED,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>FOX SEARCHLIGHT PICTURES, INC.,<br><br>     Defendant and Respondent. | B248601<br><br>(Los Angeles County<br>Super. Ct. No. SC113978) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Bobbi Tillmon, Judge.  Affirmed.

Horwitz & Levy, Jeremy B. Rosen, John F. Querio; Lavely & Singer, Martin D. Singer, Allison S. Hart for Plaintiff and Appellant.

Caldwell Leslie & Proctor, Linda M. Burrow, Michael D. Roth, Kelly Perigoe for Defendant and Respondent.

_____

In a dispute over film revenue, a referee rejected plaintiff's claim that defendant's vice-president orally agreed to pay a high royalty rate of 31.66 percent for video sales. The claimed undocumented oral understanding contradicts the parties' written agreement, which states that *rentals* have a high royalty rate while *sales* royalties are at 10 percent. The evidence amply supports the judgment. We affirm.

## FACTS

Napoleon Pictures Limited (Napoleon) premiered its film Napoleon Dynamite (the Film) at the 2004 Sundance Film Festival. The Film was produced by 24-year-old Jeremy Romney Coon, with an initial $404,000 from his family. Numerous film distributors expressed interest; it was the most sought-after film at Sundance.

Napoleon hired John Sloss to negotiate a distribution agreement for the Film. Sloss, an experienced entertainment lawyer who has sold 400 independent films, wanted Fox Searchlight Pictures, Inc. (Fox), to distribute the Film. He immediately began to negotiate terms with a friend, Fox vice-president Joseph De Marco, with whom Sloss had arranged at least 10 movie distribution deals. Sloss profits from the Film's distribution through his "advisory company," which receives 10 percent of all revenue arising from commercial exploitation of the Film.

Sloss and De Marco made a handshake deal on January 18, 2004, one day after the Film premiered. A "Term Sheet" was signed two days later. Fox paid Napoleon an acquisition price of $4.75 million, with a 50 percent gross profits participation rate. The acquisition price was high, compared to what Fox paid for other films between 2000 and 2006. When Fox pays a high acquisition price, it takes a more aggressive stance on other terms of the distribution agreement.

Central to the parties' dispute are the terms for home video royalties. Video exploitation of films is a greater source of revenue than theatrical release.[1] In 2004, the standard home video royalty rate was 20 percent. At the time, the home video market

---

[1] "Video" is a generic term for DVD's or VHS cassettes, the two formats in home movies.

was changing rapidly from consumer rentals to consumer purchases.  Coon understood the importance of the home video market.  During negotiations with Fox at Sundance, he was told that the home video royalty for the Film would be approximately 25 percent.

The Term Sheet's "participation terminology" clause reads, "Payment of any amounts provided for hereunder and all other terms and conditions related to such amounts shall be in accordance with the terms and conditions set forth herein or, if not addressed herein, in Searchlight's Definitions of Net Profits (High Price Product Royalty shall be 31.66%, with Schedule '1'-Glossary attached thereto ('Participation Definition')."  The Term Sheet does not define "High Price Product."  However, it contemplates that "formal documentation memorializing the parties' agreement will be prepared, and will contain the balance of the terms governing this agreement, which other terms shall be in accordance with Searchlight's standard agreements of this type . . . ."

Sloss did not see the Participation Definition before the Term Sheet was signed, and neither did Jeremy Coon.  However, Sloss knew that the Participation Definition is a pre-negotiated, standardized document created by Fox, from his past dealings with De Marco.  At trial, Sloss referred to the Participation Definition as "boilerplate" that "was never negotiated," but was part of past agreements.  In each distribution deal, Sloss and De Marco discussed the sell-through rate for video royalties, which "was always the 10 percent in the boilerplate," although he believed that the 10 percent rate only applied to "bargain bin" sales.  Sloss agreed that "bargain bin" sales are not mentioned in the Term Sheet or the Participation Definition, or anywhere else, although the Participation Definition defines other important capitalized terms in the Term Sheet, such as "Remaining Gross Receipts," "Net Profit," and "Distribution Expenses."

Between February and May 2004, Fox's in-house counsel Jamie Taylor sent drafts of a formal agreement to a partner at Sloss's firm, Paul Brennan.  Initial drafts did not include an exhibit relating to home video royalties (and other issues), entitled "Exhibit 'A' Definition of Defined Net Proceeds/Acquisition" (Exhibit A).  Attorney

3

Brennan stated that he only reviewed exhibits provided to him, and might not be aware if a document referred to in the Term Sheet is missing from the long-form agreement.[2]

On appeal, Napoleon does not contest that Taylor sent a hard copy of Exhibit A to Brennan on May 10, 2004, though neither Brennan nor Sloss recalled it. Two days later, Taylor sent a letter to Brennan that alluded to Exhibit A, along with a copy of the agreement to be signed by Napoleon. Brennan denied receiving Exhibit A, but never asked Taylor to provide a copy, despite Taylor's repeated references to Exhibit A in his correspondence.

Napoleon's principal Coon signed the agreement on Brennan's advice and the document was returned to Fox on May 20, 2004. A fully executed copy of the Agreement and its attachments—including Exhibit A—was sent to Brennan in July 2004. Brennan did not contact Taylor to inquire about Exhibit A, and Sloss did not recall reading it.

The document signed by the parties is entitled "Standard Terms and Conditions Distribution Rights Acquisition Agreement" (the Agreement). The signature page of the Agreement states, "No representations or warranties of any kind have been made by either of the parties to induce the making of this Agreement, except as set forth specifically herein." The Agreement provides that "All terms initially capitalized are specifically defined terms and shall be defined as set forth in the documents in which they appear within quotation marks" in the Term Sheet. The words "Participation Definition" are quoted in the Term Sheet and "High Price Product Royalty" is capitalized.

The Term Sheet is six pages long and contains capitalized-but-undefined terms. The main body of the Agreement is 12 pages. By contrast, Exhibit A of the Agreement (plus its Glossary) is 49 pages. Exhibit A states in bold letters that it "is a contractual formula for the definition and possible payment of contingent compensation which

---

[2]    The referee deemed Brennan's testimony "illogical and implausible" and "simply not believable."

4

Participant acknowledges to be highly speculative." Contingent compensation is money earned after Fox recouped its acquisition fee of $4.75 million.

Exhibit A addresses video royalties. It defines "High Price Sales/Rental Royalty" as monies Fox derives from video cassette distribution to wholesale dealers, which are intended for *rental* by the public. It defines "Sell-Through Royalty" as 10 percent of the monies Fox derives from sales of videos intended for *purchase* by the public. Exhibit A makes no distinction between full price sales and discounted sales.[3] Sloss told De Marco that the definitions of high price and sell-through royalties in Exhibit A are "vague" and "confusing," but did not ask De Marco to clarify the terms during their negotiations or have De Marco write down that the high price royalty rate of 31.66 percent will apply to the great majority of video distribution.

After acquiring the Film, Fox engaged MTV to promote it. MTV and the Film both appeal to a youthful audience. Fox agreed to pay MTV 5 percent of the Film's defined gross proceeds in exchange for promotional support, including airtime and the creation of advertising spots. MTV hosted live appearances by the Film's cast and created nine "interstitial" advertisements ending with the words "Go see Napoleon Dynamite" that aired on MTV 1,612 times from June to August 2004.

The value of the airtime provided by MTV was over $4.5 million. MTV received compensation of $2.4 million from Fox. Under the terms of Exhibit A, Fox deducted the compensation it paid to MTV as a cost "directly related to or allocable to (as Fox may reasonably determine in good faith) the advertising, publicizing and promoting of the Picture in any way . . ." in publications, radio or television, websites, and so on.

The Film was successful when released in June 2004, with theatrical revenues of nearly $45 million. Fox made payments to Napoleon (and to Sloss's advisory company) as described in the Term Sheet and Exhibit A. Sloss thought that the home video

---

[3] A prior version of Exhibit A dating to the 1990's had a formula for determining "Economy Line Sales." By 2001, the Exhibit A to distribution agreements negotiated by Sloss and De Marco no longer included "economy line sales."

payments were "low" in the 2005-2006 participation statements, but he did not call De Marco to inquire about the low numbers.

In 2006, Napoleon demanded an audit of Film revenues. Exhibit A authorizes an audit, as noted by Roy Silva, an attorney Coon consulted, who reviewed all documents from Fox that Coon had in his possession. Napoleon appointed as its auditor Steven Sills, a CPA and lawyer who has performed over 2,000 motion picture and television audits since 1982. Sills negotiates contracts and settlements, and is a certified fraud examiner.

Sills obtained from Sloss or Napoleon the Term Sheet, the Agreement and Exhibit A. Coon referenced Exhibit A in an e-mail he sent to Sills on January 9, 2008. Proceeding from the assumption that these documents govern profit participation, Sills's first report in 2010 applied a 31.66 percent rate for High Price royalties and 10 percent for Sell-Through royalties.

After discussion with Sloss, Sills redrafted his report. Sloss sent Fox the "final audit report" on February 16, 2011. It states, "The Agreement provides for a 31.66% royalty on 'High Price' receipts and a 10% royalty on 'Sell Through' receipts. You have informed us that during the negotiation of the Agreement, Fox's representatives informed you that they anticipated a net overall royalty rate of 25%. [¶] Due to the change in the video marketplace from a rental market to a sell-through market, 87% of the Picture's video sales were at the lower rate, resulting in an overall video royalty rate of 12.88%. It should be noted that this rate is approximately one-half of the industry standard minimum rate of 20%. [¶] Had Fox reported to you based on the 25% overall rate provided to you during the contract negotiations, home video royalties would have been increased by $16,894,429." At trial, Sloss felt that Sills "misunderstood" their discussion, resulting in the language Sills employed about an anticipated overall royalty rate of 25 percent.

In 2012, during this litigation, Sills amended his report yet again, writing that "the Exhibit A that we had in our file, which we used in preparation of the initial reports, was not applicable to this contract." Sills reached this conclusion after speaking to Sloss, who

6

believed that Fox promised a 31.66 percent royalty on everything except "bargain bin" videos that a shopper might pick up in the center aisle at Walmart.

Sills's revised 2012 audit report states that all home video sales should be reported at a 31.66% royalty rate, regardless of whether it was "high price" or "sell-through." It concludes, "Had Fox reported to you based on the negotiated terms of the Agreement of 31.66%, home video royalties would have been increased by $26,176,571." The new report omits reference to a 25 percent overall rate promised during contract negotiations.

## PROCEDURAL HISTORY

Napoleon filed suit against Fox in 2011, alleging claims for breach of contract; promissory estoppel; negligent misrepresentation; reformation; and an accounting. The Term Sheet, the Agreement, and Exhibit A were attached to the complaint. The complaint alleges that Fox's De Marco (who died in 2008, before this lawsuit was filed) represented that Napoleon would receive a net overall royalty of approximately 25 percent of the net profits from home video sales. Napoleon relied upon this when granting Fox distribution rights to the Film. Napoleon claimed that it received Exhibit A "for the first time" in July 2004, two months after Coon signed the Agreement.

As required by the Agreement, the parties stipulated to the appointment of a referee, a retired judge. (Code Civ. Proc., § 638.) The referee conducted a 14-day bench trial. During trial, Napoleon amended its complaint to allege that Fox improperly deducted payments made to MTV. The referee issued a statement of decision. The trial court adopted the statement of decision and entered judgment on it.

## THE STATEMENT OF DECISION

The referee produced an 80-page statement of decision with an extensive summary of the evidence. She found that the preliminary Term Sheet incorporated by reference a Participation Definition.[4] Before Napoleon executed the final agreement, it was advised of the applicable Participation Definition. For nearly seven years, the parties conducted

---

[4] Exhibit A to the Agreement is the Participation Definition, which plaintiff calls "the Definition" and defendant calls "the A-level Acquisition Definition."

7

themselves in a manner consistent with the understanding that Fox's Participation Definition governed their agreement. When the Term Sheet is read in conjunction with the Participation Definition, it discloses that the High Price Royalty of 31.66 percent applies only to video rentals and not to consumer purchases of the video: it cannot be construed to apply to all home video sales except bargain bin. The parties' agreement provides a 10 percent royalty rate for all sell-through revenue. The referee characterized the parties' agreement with respect to royalties as "not ambiguous."

The referee declined to reform the parties' agreement to reflect an oral agreement that the 31.66 percent royalty rate applies to all video sales (other than bargain bin). The only evidence of an oral understanding came from Sloss, because De Marco died before trial. The court rejected Sloss's testimony because it "is not only contrary to the terms of an expressly integrated agreement, but is not memorialized or confirmed in a single piece of paper" or e-mail. It "strains reason" to believe that an aggressive, experienced lawyer like Sloss would not document a purported oral agreement limiting the 10 percent royalty rate to bargain bin sales.

Napoleon's auditor, Sills, initially wrote a report following the terms of the written Term Sheet and Participation Definition, applying a 10 percent royalty rate to all sales. No agreement was ever reached defining "bargain bin" and it was never clarified how Fox's accounting department could implement an undocumented and undefined agreement. The "final" audit report that Sloss sent to Fox refers to the Term Sheet and Exhibit A, but notes an oral representation about a net overall royalty of 25 percent. Sloss did not claim a purported 31.66 percent agreement for everything but bargain bin until after this litigation started. There is no proof of a mutual or unilateral mistake, and Sloss's version of the parties' agreement is "inherently incredible."

Fox cannot be liable on a theory of negligent misrepresentation. As a "shrewd and experienced negotiator," Sloss knew that the Fox definitions included a 10 percent royalty for all sell-through. The alleged oral misrepresentations are inconsistent with the written agreement, which is fatal to Napoleon's claim. Parol evidence cannot be used to contradict the terms of the written contract. The claim for promissory estoppel fails

8

because the alleged promise is not sufficiently delineated, the parties executed a written agreement for consideration, and Sloss did not reasonably rely on De Marco's representations that sell-through royalties would be de minimis.

The referee rejected Napoleon's claim that Fox misclassified $7.6 million in home video revenue as sell-through, rather than rental. First, Napoleon did not assert this claim at trial. Second, the claim was not established. Sills testified that Fox properly accounted for revenues based on the definitions in Exhibit A.

The referee rejected Napoleon's contract claims for underreported video on demand; merchandising fees; residuals; foreign version costs; price protection reserves; prime time media charges; foreign tax credits; and paying for MTV advertising through a participation plan. The referee did find that Fox inadequately documented advertising expenses and credited Napoleon with $125,357. Also, Napoleon was credited with a small amount for electronic sell-through.

**DISCUSSION**

## 1. **Appeal and Review**

Appeal is taken from the judgment. (Code Civ. Proc., § 904.1, subd. (a)(1).) Napoleon challenges the sufficiency of the evidence supporting the referee's decision, which we review as if made by the trial court. (Code Civ. Proc., § 645.) We must affirm the judgment if the record contains substantial evidence, contradicted or uncontradicted, to support the referee's determinations; we cannot substitute our deductions for those of the trier of fact. (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874.) Substantial evidence has ponderable legal significance, is reasonable, credible and of solid value. (*Ibid.*; *Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651.)

"On substantial evidence review, we do not 'weigh the evidence, consider the credibility of witnesses, or resolve conflicts in the evidence or in the reasonable inferences that may be drawn from it.'" (*Do v. Regents of University of California* (2013) 216 Cal.App.4th 1474, 1492.) Because there is a statement of decision setting forth factual and legal bases, "any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of" the determinations made in the

9

decision.  (*In re Marriage of Hoffmeister* (1987) 191 Cal.App.3d 351, 358.)  The statement of decision makes repeated credibility assessments about witness testimony.  The finder of fact "is the *exclusive* judge of the credibility of the witnesses.  [Citations.]  The trial court is free to disbelieve and reject the testimony of witnesses even though they are uncontradicted and unimpeached."  (*Maslow v. Maslow* (1953) 117 Cal.App.2d 237, 243; *Meiner v. Ford Motor Co.* (1971) 17 Cal.App.3d 127, 140-141.)

Although a contract is interpreted de novo, if extrinsic evidence is admitted as an aid to interpretation, the trial court's reasonable construction of the agreement— supported by substantial evidence—will be upheld if it "turns upon the credibility" of conflicting evidence.  (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865; *In re Marriage of Fonstein* (1976) 17 Cal.3d 738, 746-747; *Roddenberry v. Roddenberry*, *supra*, 44 Cal.App.4th at p. 651.)  Extrinsic evidence cannot be used to give the contract a meaning to which it is not reasonably susceptible.  (*Parsons*, at p. 865.)

## 2.  **Breach of Contract Claim**

### a. *Rules of Contract Interpretation*

A contract is interpreted to give effect to the mutual intention of the parties at the time of contracting, if ascertainable.  (Civ. Code, § 1636.)  The parties' mutual intent is determined solely from the language of a written contract whenever possible, analyzing the clear and explicit meaning of its provisions in their ordinary and popular sense.  (Civ. Code, §§ 1638, 1639; *ASP Properties Group, L.P. v. Fard, Inc.* (2005) 133 Cal.App.4th 1257, 1269.)  The execution of a written contract "supersedes all the negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument."  (Civ. Code § 1625.)

Terms contained in a writing intended to be the final expression of the parties' agreement "may not be contradicted by evidence of a prior agreement or of a contemporaneous oral agreement."  (Code Civ. Proc., § 1856, subd. (a).)  Evidence of an oral agreement cannot alter the obligations in a written instrument.  (*Casa Herrera, Inc. v. Beydoun* (2004) 32 Cal.4th 336, 344.)  Contractual terms may be explained or supplemented by evidence of consistent additional terms, unless the court determines that

the writing was intended as a complete and exclusive statement of terms; terms may be explained or supplemented by course of dealing, usage of trade, or by course of performance; and evidence may be admitted to show a mistake or imperfection in the writing. (Code Civ. Proc., § 1856, subd. (b).)

Extrinsic evidence is admissible to interpret a contract that is either ambiguous on its face or is reasonably susceptible of two or more interpretations. (*Bill Signs Trucking, LLC v. Signs Family Limited Partnership* (2007) 157 Cal.App.4th 1515, 1521.) A two-step process applies to the admission of extrinsic evidence. First, the court provisionally receives any credible evidence concerning the parties' intentions to determine "ambiguity," i.e., whether the contract language is reasonably susceptible to the interpretation urged by a party. Second, if it finds an ambiguity, the court admits the extrinsic evidence to interpret the contract. (*Ibid.*; *Pacific Gas & E. Co. v. G.W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37.)

### b. *Exhibit A Is Incorporated into the Parties' Agreement*

Napoleon contends that the referee erroneously interpreted "High Price Product Royalty" in the Term Sheet. In plaintiff's view, the term "takes its meaning from the parties' mutual understanding at the time the term sheet was signed—i.e., that the 31.66 percent royalty rate applies to all home video sales except bargain bin sales." This oral understanding applies, Napoleon argues, because Exhibit A is not incorporated by reference into its agreement with Fox.

A document may be incorporated by a clear and unequivocal reference that is called to the attention of and consented to by the contracting party, and is known or easily available to the parties. (*Shaw v. Regents of the University of California* (1997) 58 Cal.App.4th 44, 54.) The Term Sheet states that "participation terminology" payment amounts, if not defined in the Term Sheet itself, "shall be" in accordance with Fox's Participation Definition. The Term Sheet does not define "High Price Product Royalty." As a result, the participation definitions contained in Exhibit A must be incorporated into the Term Sheet. On its face, Exhibit A states that it is "a contractual formula for the definition and possible payment of contingent compensation," which includes royalties.

11

The reference in the Term Sheet to Fox's participation definitions is clear and unequivocal. It is not necessary that the definitions incorporated by reference be physically part of the basic contract, nor is there a need to recite that the contract "incorporates" another document, so long as the party is guided to it. (*Chan v. Drexel Burnham Lambert, Inc.* (1986) 178 Cal.App.3d 632, 641; *Avidity Partners, LLC v. State of California* (2013) 221 Cal.App.4th 1180, 1194.) Exhibit A is part of previous film distribution deals that Sloss negotiated with De Marco: Sloss knew that Exhibit A is always part of Fox's agreements, even if he dismissed it as "boilerplate." The distinction between "High Price" rentals to the public and "Sell-Through" sales to the public in Exhibit A existed in 2001, when Sloss negotiated terms with De Marco for the movies Kissing Jessica Stein, The Waking Life, Super Troopers, and The Deep End. In each instance, the "Sell-Through" rate was 10 percent, as it is here. Fox's definitions were always in an "Exhibit A."[5] Between 2001 and 2004, Sloss did nothing to ensure that the "Sell-Through" rate was only applied to "bargain bin" sales.

The Term Sheet contemplated that "formal documentation memorializing the parties' agreement will be prepared, and will contain the balance of the terms governing this agreement, which other terms shall be in accordance with Searchlight's standard agreements of this type . . . ." The Term Sheet authorized the incorporation of Exhibit A, which is Fox's standardized, pre-negotiated rider. Sloss acknowledged that De Marco said during negotiations, "'I will give you an A-Level Rider'" (meaning Exhibit A), the best deal that Fox gives to anyone. An experienced film agent like Sloss, who is familiar with a movie studio's standard contract, binds his principal to it, even if he fails to communicate the provisions to his client. (*Columbia Pictures Corp. v. DeToth* (1948) 87

---

[5]    The reply brief pushes boundaries by arguing that Sloss was "under a duty not to disclose" Fox's standard participation definitions to Napoleon because Exhibit A is privileged and confidential. Fox created Exhibit A. Fox is not Sloss's client, so information Fox provided to Sloss is not secret. (Bus. & Prof. Code, § 6068, subd. (e) [an attorney must "preserve the secrets of his or her client"].)

Cal.App.2d 620, 628-631, cited with approval in *O'Riordan v. Federal Kemper Life Assurance Co.* (2005) 36 Cal.4th 281, 288.)

Sloss and Brennan had a duty to familiarize themselves with Fox's "standard agreements" (including Exhibit A) that "contain the balance of the terms governing this [Term Sheet]." If they failed to receive or misplaced Exhibit A, after Taylor referred to it in correspondence, additional copies were easily available. A contracting party is bound by terms contained in an unattached, but easily available, Exhibit A. (*Wolschlager v. Fidelity National Title Ins. Co.* (2003) 111 Cal.App.4th 784, 787, 791.) There is no plausible reason why the attorneys failed to examine Exhibit A before Coon signed the Term Sheet in January 2004, and if necessary, obtain *written* clarification of the rate for "Sell-Through" before Coon signed the Agreement in May 2004. Their failure to do so "flies in the face of reason," as stated by the referee. Sloss's reliance on oral assurances was unfounded, not to mention barred by the Agreement's integration clause.

Coon and his attorney Roy Silva relied upon Exhibit A in demanding an audit of the Film's revenues. Only Exhibit A authorizes an audit, not the Term Sheet or the main body of the Agreement.[6] Silva's e-mail to Coon referred to Exhibit A as "the contract" and described it as "pretty clear." Coon forwarded the e-mail to Sills, who prepared an initial audit report based on Exhibit A and the Term Sheet.

Napoleon cannot cherry-pick favorable parts of Exhibit A as being incorporated into the Term Sheet (such as the right to an audit), while claiming that the part that is unfavorable (the Sell-Through royalty rate) is not incorporated. Sloss sent Fox a 2011 "final audit report" that acknowledged a *written* agreement to pay 10 percent for Sell-Through (from Exhibit A), but suggests an *oral* agreement that Fox "anticipated a net overall royalty rate of 25%." The claim that Exhibit A does not apply at all was devised after this lawsuit was filed.

---

[6]   In its reply brief, Napoleon for the first time contends that it relied upon the implied covenant of good faith and fair dealing to request an audit, not on Exhibit A. No evidence supports this newly minted theory.

13

Although the Term Sheet describes Fox's participation definition as encompassing "Definitions of Net *Profits*" and Exhibit A is entitled "Definition of Defined Net *Proceeds*," Sloss acknowledged that the industry moved away from the term "net profits" but the change in terminology did not affect the "substance of what those agreements said." Indeed, before Napoleon signed the Agreement, Fox attorney Jamie Taylor pointed out in a letter to Napoleon attorney Paul Brennan that the Term Sheet uses the "obsolete" words "net profits" when referring to Fox's participation definitions, although Exhibit A attached to his letter uses "net proceeds."

No evidence supports Napoleon's claim that Exhibit A is not incorporated by reference into the Term Sheet. The Term Sheet contemplates that Exhibit A will provide necessary participation definitions. Exhibit A was sent to Brennan before Napoleon signed the Agreement, and it was previously used by Sloss and De Marco in other distribution agreements. As noted by the referee, the only portion of Exhibit A that did not "exist" when the Term Sheet was executed was the blank space for Napoleon's name. The parties' conduct in conducting an audit shows their mutual awareness that Exhibit A was incorporated by reference and governs their relationship.

### c. *Parol Evidence of an Oral Understanding Does Not Control*

Contrary to Napoleon's claim, parol evidence of an oral understanding between Sloss and De Marco does not control here. The referee characterized the parties' written agreement as "not ambiguous." We agree. Exhibit A, which was incorporated by reference into the Term Sheet, clearly draws a distinction between "High Price" royalties (defined as video rentals to the public) and "Sell-Through" royalties (defined as video sales to the public). The negotiated rate of 31.66 percent applies to "High Price" sales. "Sell-Through" was 10 percent. The parties' agreement is not ambiguous on its face.

Extrinsic evidence may be received to determine whether contract language is *reasonably susceptible* to the interpretation urged by plaintiff. (*Bill Signs Trucking, LLC v. Signs Family Limited Partnership*, *supra*, 157 Cal.App.4th at p. 1521.) The referee rejected plaintiff's extrinsic evidence, finding it "strains reason" to believe that an experienced lawyer like Sloss would fail to memorialize or confirm an alleged oral

14

understanding in a single piece of paper or e-mail, particularly when the signed Agreement expressly forbids reliance on oral representations by either party.

When the trier of fact finds the lead witness's testimony "inherently incredible," as it did here, it is not our role as a reviewing court to credit testimony that the referee rejected. De Marco, the only person who could gainsay the alleged oral understanding, died before Napoleon filed suit. Nevertheless, the referee, as exclusive judge of witness credibility, was free to disbelieve Sloss, even if his testimony was uncontradicted. "The trier of the facts is not required to accept the testimony of a witness as true though it stands uncontradicted where the trier of the facts determines that such testimony is false." (*People v. Woods* (1946) 75 Cal.App.2d 246, 248.) Sloss is not a neutral witness: he stands to benefit from the outcome of this litigation because his advisory company is entitled to 10 percent of Fox's payment.

Absent credible evidence of an oral understanding, the parties' distribution agreement is not reasonably susceptible of the interpretation that Napoleon places on it. "High Price" and "Sell-Through" are specifically defined terms, with different royalty rates. The purported oral understanding—that there was one royalty rate for everything except bargain bin sales—contradicts the writings. The Term Sheet indicates that the high rate applies to "High Price" royalties. Just above the signature line, the Agreement states, "No representations or warranties of any kind have been made by either of the parties to induce the making of this Agreement." Applying the usual rules of contract interpretation, the terms of the writing cannot be contradicted by evidence of a contemporaneous oral agreement. (Code Civ. Proc., § 1856, subd. (a); *Casa Herrera, Inc. v. Beydoun*, *supra*, 32 Cal.4th at p. 344.)

## 3. Reformation of Contract Claim

Napoleon asserts that the referee should have reformed the parties' agreement due to mutual mistake. A written contract may be reformed when, through fraud or mutual mistake of the parties, it "does not truly express the intention of the parties." (Civ. Code, § 3399.) Mutual mistake may be shown with undisputed evidence that all parties incorrectly believed their written documents were sufficient to carry out their manifest

intentions. (*Jones v. First American Title Ins. Co.* (2003) 107 Cal.App.4th 381, 389.) Napoleon maintains that it has "amply demonstrated that Sloss and De Marco intended the 31.66 percent royalty rate to apply to all home video sales except bargain bin sales and mistakenly assumed that the term 'High Price Product Royalty' in the term sheet would encompass that understanding."

The record does not demonstrate that De Marco intended for the royalty rate for home videos to be anything other than what is expressed in the parties' written agreement. Prior film distribution agreements negotiated by Sloss and De Marco had two-tiered royalty rates, including a 10 percent Sell-Through rate. Fox's agreement with Napoleon was consistent with the parties' prior agreements, not a mistake.[7]

The concept of "bargain bin" does not appear in the Term Sheet, the Agreement, or Exhibit A. Nor does it appear elsewhere, such as a letter or e-mail. Sloss admitted as much at trial. There is no credible showing that the parties ever negotiated a "bargain bin" price. There was no proof that De Marco instructed Fox's accounting department to separate out "bargain bin" sales and make 10 percent royalty payments on those sales alone. All Fox sales, whether full price or deeply discounted, flow through the "sell-through" classification in the company's general ledger. Without any proof of a meeting of the minds regarding "bargain bin" sales, the written agreement cannot be reformed.

Critically, the referee discounted Sloss's testimony regarding an undocumented agreement to pay a high royalty rate for video sales, finding that it "strains reason [that] he did not document any of the several identical conversations he purports to have had repeatedly with De Marco" for five movies, including the Film. Sloss could have pursued a resolution of this purported misunderstanding with De Marco in 2005-2006, when Sloss first noticed that Fox's payments were "low." Instead, Sloss waited until De Marco's death to posit the existence of an oral understanding about royalty rates that

---

**7** Sloss and De Marco negotiated a 31.66 percent rate for *both* high price and sell-through royalties in 2006, for the movie Little Miss Sunshine, as shown in the term sheet for that deal.

conflicted with Napoleon's written agreement. The referee properly declined to reform the parties' written agreement because there is no substantial evidence of a mutual intent that is different from what is expressed in the Term Sheet and Exhibit A.

## 4. Negligent Misrepresentation Claim

The elements of a claim for misrepresentation are a misrepresentation of fact with reasonable grounds for believing it to be true, made with the intent to induce reliance, and justifiable reliance on the misrepresentation. (*Thrifty Payless, Inc. v. The Americana at Brand, LLC* (2013) 218 Cal.App.4th 1230, 1239.) The alleged misrepresentation is that De Marco assured Sloss that the overwhelming majority of home video royalties comes from "high price" receipts, and other video receipts ("sell-through") were de minimis, drastically reduced sales to the public.

To the extent that De Marco tried to prognosticate future sales at any price point, Sloss could not reasonably rely on that speculation because Sloss himself testified that the video market "was mutating on a daily basis" and "was in complete flux" in 2004. In any event, as an experienced film agent, Sloss was as well placed as De Marco to predict whether home video sales trends would continue or dissipate.

Beyond that, Napoleon's claim of misrepresentation once again seeks to ignore the terms of the parties' written, integrated agreement and enforce an undocumented oral assurance at odds with the written agreement. This cannot be done. (*Alling v. Universal Manufacturing Corp.* (1992) 5 Cal.App.4th 1412, 1436-1437.) The parol evidence rule protects the terms of a valid written contract, although it does not bar evidence challenging the validity of the agreement itself if the plaintiff wishes to prove that the instrument is void or voidable because it was procured by fraud. (Code Civ. Proc., § 1856, subds. (a), (f); *Riverisland Cold Storage, Inc. v. Fresno-Madera Production Credit Assn.* (2013) 55 Cal.4th 1169, 1174-1175, 1182 ["fraud undermines the essential validity of the parties' agreement"].) Napoleon does not argue that its agreement with Fox is void and invalid; rather, it wants to enforce the agreement but get more money. Even if Napoleon's parol evidence was considered, it did not prove its claim because the

referee disbelieved Sloss, whose testimony about the alleged misrepresentations made by De Marco was "inherently incredible."

## 5. Napoleon's Challenge to Payments Made to MTV

The Term Sheet specifies that distribution expenses are to be deducted from Napoleon's profit participation. Exhibit A defines distribution expenses as the cost of purchasing advertising time on television (among other costs). There is no limitation on how payments to advertisers must be structured, only that Fox exercise good faith in assessing costs directly related to publicizing and promoting the Film.

Napoleon objects to the deal Fox struck with MTV—giving MTV a profit participation instead of paying outright for the 1,612 interstitial advertisements that ran on MTV in 2004. Exhibit A, which is incorporated into the Term Sheet, does not prohibit the arrangement that was reached between Fox and MTV. The advertisements were a cost of purchasing television time to maximize the Film's exposure, especially when tied into appearances by the Film's cast on MTV. Napoleon's claim is odd: had Fox paid MTV directly for the airtime, instead of through a participation agreement, it would have cost Fox (and Napoleon) over $4.5 million. Fox paid MTV only $2.4 million, less than half the value of the airtime. It makes no sense for Napoleon to argue that Fox should have paid MTV twice as much for the Film's MTV air time.

Sloss testified that he wanted Fox to distribute the Film because of its superior marketing techniques. Obviously, that turned out to be true: the Film's revenues exceeded its production costs by tens of millions of dollars. It cannot be said, given the Film's success, that Fox's decision to partner with MTV was foolish, or that charging the cost to Napoleon was in bad faith. Napoleon must bear its share of the cost of the agreement to secure advertising on MTV.

## CONCLUSION

Despite a lengthy record, this case is not complicated. The parties entered a written film distribution agreement in 2004 that contains two royalty rates, one for home video rentals and one for consumer purchases, plus a clause stating that "no representations or warranties of any kind have been made by either of the parties to

18

induce the making of this Agreement, except as set forth specifically herein." Plaintiff's agent-attorney Sloss testified to an oral understanding that contradicts the written agreement. The trier of fact found the written agreement "not ambiguous" and also found that the testimony contradicting it is "inherently incredible" and "defies reason."

Plaintiff insisted that Exhibit A was a newly created and mysterious addition to the Term Sheet. Exhibit A is *always* part of Fox's film deals because it defines participation terms. The Term Sheet and the Agreement are meaningless without the implementing language in Exhibit A. That is why the Term Sheet is only six pages, but Exhibit A is 49 pages. Plaintiff relied on Exhibit A to determine its right to an audit and Fox allowed the audit thanks to Exhibit A. Sloss was familiar with Exhibit A as Fox's standard agreement containing the balance of the terms governing the parties' relationship. This knowledge is imputed to plaintiff.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


BOREN, P.J.

We concur:


ASHMANN-GERST, J.


HOFFSTADT, J.

19